## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
## SOUTHERN DIVISION

DEVON BARTHOLOMEW;
SUSAN CARMINE;
LYNN HOLLAND; *and*
ROBERT JOHNSON,

      Plaintiffs,

      *v.*

CORTEVA, INC.;
DUPONT DE NEMOURS, INC., FORMERLY
    KNOWN AS DOWDUPONT, INC.;
EIDP, INC., FORMERLY KNOWN AS E. I. DU
    PONT DE NEMOURS AND COMPANY;
THE CHEMOURS COMPANY; *and*
THE CHEMOURS COMPANY FC, LLC,

      Defendants.

**7:23-cv-01592**

**COMPLAINT**

**JURY TRIAL REQUESTED**

## NATURE OF THE ACTION

1.     This case arises from a nearly four decades-long history of Defendants discharging toxic substances into the Cape Fear River (hereinafter "River") without regard for the resulting impact on downstream consumers and the environment. Plaintiffs are among those impacted by Defendants' negligent conduct and have filed this action seeking judicial redress for their personal injuries.

2.     Defendants willfully and wantonly discharged toxic, cancer-causing chemicals into the River, which serves as the primary source of drinking water for thousands of North Carolina residents. Defendants have owned and operated the Fayetteville Works Plant (hereinafter "FWP") for more than four decades. FWP is a manufacturing facility located at 22824 NC Highway 87 West, Fayetteville NC 28306-7332. Defendants routinely discharged wastewater containing per- and polyfluoroalkyl substances (hereinafter "PFAS"), such as the ammonium salt of hexafluoropropylene oxide dimer acid (hereinafter "GenX"), directly into the River from the FWF.

3.     Defendants discharged GenX and other PFAS at the FWP knowing they were extremely dangerous and that even exceedingly small doses could cause liver, testicular, pancreatic, uterine and kidney cancer, as well as thyroid disease, ulcerative colitis, and pregnancy-induced hypertension, among other illnesses. Nevertheless, Defendants discharged these chemicals into the air and water surrounding the FWP, simply to avoid the expense of taking safety precautions. Knowing that their conduct was wrongful, Defendants lied to government regulators, claiming that they were either disposing of PFAS at a secure, off-site facility or incinerating them These lies endangered nearby residents by preventing state regulators and local water providers from taking those actions necessary to protect them from drinking dangerous amounts of GenX and other PFAS discharged from the FWP.

4.     Defendants have a long history of polluting the environment with PFAS, most notably in connection with the bio-persistent, bio-accumulative, and toxic chemical perfluorooctanoic acid (hereinafter "PFOA" or "C8"). In or around 1951, Old DuPont began using PFOA to make consumer products, including the immensely popular Teflon® non-stick coating used in cookware, and the company reaped huge profits from its manufacture of products containing PFOA in the ensuing decades. When Old DuPont's supplier, the 3M Company, decided in 2002 to phase out its production of PFOA after coming under increasing scrutiny from the United States Environmental Protection Agency (hereinafter "EPA"), Old DuPont began increasing its manufacturing of PFOA at the FWP, assuring regulators and the public that PFOA was safe and that any wastewater containing PFOA would be disposed of at a secure, off-site facility.

5.     Only after being sued by nearby residents of another plant in West Virginia that Old DuPont used to manufacture PFOA, did the public become privy to evidence showing Old DuPont's internal knowledge of the hazards PFOA posed to the environment and human health.

In 2015, as part of a settlement with those West Virginia residents, an expert panel of epidemiologists determined that PFOA discharges at the plant had contaminated the residents' drinking water and put them at an increased risk of developing kidney cancer, testicular cancer, ulcerative colitis, thyroid disease, hypercholesterolemia, and pregnancy-induced hypertension.

6.     The impact of this chapter of Defendants' insidious poisoning of the nation's rivers and drinking-water supplies has been devastating, particularly for the residents of New Hanover, Bladen, Brunswick, Cumberland, and Pender Counties in North Carolina that use the Cape Fear River as a primary source of drinking water.

7.     Bladen, Brunswick, Pender, and New Hanover Counties, for instance, have among the highest concentrations of liver disease in the United States.  In addition, the rate of liver and testicular cancers in New Hanover County is considerably higher than the state average, the rate of kidney cancer in Bladen County is significantly higher than the state average, the rate of pancreatic cancer in Brunswick County is substantially higher than the state average, and the rate of uterine cancer in Cumberland County is also higher than the state average.

8.     The impacted downstream residents in North Carolina include Plaintiffs who consumed drinking water that had been willfully, recklessly, and negligently contaminated by Defendants and suffered personal injuries.

<u>**JURISDICTION AND VENUE**</u>

9.     This Court has Subject Matter Jurisdiction in this matter per 28 U.S.C. § 1332, because complete diversity exists between the parties and damages are more than $75,000.00. Plaintiffs are citizens of the State of North Carolina, and the Defendants are incorporated and maintain principal places of business in states other than North Carolina.

10.     Venue is appropriate per 28 U.S.C. § 1391(a) because a substantial part of the property that is the subject of this action is situated in this judicial district and division.

11.     The Court has personal jurisdiction over Defendants because each has personally availed itself of the benefits and protections of the laws of the State of North Carolina. Each of the Defendants conducted business and committed torts in North Carolina, by itself or through an agent or alter ego, which caused Plaintiffs to suffer severe personal and property-based damages within the state.

## PARTIES

12.     Plaintiff, DEVON BARTHOLOMEW, currently resides in New Hanover County, North Carolina, and has resided there for all times relevant to this matter.

13.     Plaintiff, SUSAN CARMINE, currently resides in New Hanover County, North Carolina, previously resided in Pender County, North Carolina, and has resided there for all times relevant to this matter.

14.     Plaintiff, LYNN HOLLAND, currently resides in Brunswick County, North Carolina, and has resided there for all times relevant to this matter.

15.     Plaintiff, ROBERT JOHNSON, currently resides in Cumberland County, North Carolina, and has resided there for all times relevant to this matter.

16.     Defendant, EIDP, Inc., formerly known as E. I. du Pont de Nemours and Company (hereinafter "Old DuPont"), is a Delaware Corporation with its principal place of business at 974 Centre Road, Wilmington DE 19805-1269. It is subject to service of process via its registered agent, The Corporation Trust Company, Corporation Trust Center, 1209 North Orange Street, Wilmington DE 19801-1120. Old DuPont owned the FWP from the early 1970s until 2015, when ownership was shifted to an Old DuPont spin-off company - The Chemours Company.

17.     Defendant, The Chemours Company (hereinafter "Chemours Co."), is a Delaware Corporation with its principal place of business located at 1007 North Market Street, Wilmington DE 19801-1227. It is subject to service of process via its registered agent, The Corporation Trust

Company, Corporation Trust Center, 1209 North Orange Street, Wilmington DE 19801-1120. In 2015, Old DuPont spun off its performance chemicals business to Chemours Co., along with vast environmental liabilities which Chemours Co. assumed, including those related to PFAS like GenX.

18.     On information and belief, Chemours Co. was incorporated as a subsidiary of Old DuPont as of April 30, 2015. From that time until July 2015, Chemours Co. was a wholly owned subsidiary of Old DuPont.

19.     In July 2015, Old DuPont spun off Chemours Co. and transferred to Chemours Co. its "performance chemicals" business line, which includes its fluoroproducts business, distributing shares of Chemours Co. stock to Old DuPont stockholders, and Chemours Co. has since been an independent, publicly traded company. On information and belief, Chemours Co. became the owner and operator of the FWP as part of the July 2015 spin-off transaction (the "Chemours Spinoff").

20.     Defendant, The Chemours Company FC, LLC, is a Delaware Limited Liability Company with its principal place of business located at 1007 North Market Street, Wilmington DE 19801-1227. It is subject to service of process via its registered agent, The Corporation Trust Company, Corporation Trust Center, 1209 North Orange Street, Wilmington DE 19801-1120. The Chemours Company FC, LLC is a subsidiary of Chemours Co., and the two entities are referred to in this complaint collectively as "Chemours". On information and belief, Chemours Company FC, LLC either currently owns or has very recently owned and operated the FWP.

21.     Defendant, DuPont de Nemours, Inc., formerly known as DowDuPont, Inc. (hereinafter "New DuPont"), is a Delaware Corporation with its principal place of business at 974 Centre Road, Wilmington DE 19805-1269 and 2211 H H Dow Way, Midland MI

48642-4815. It is subject to service of process via its registered agent, The Corporation Trust Company, Corporation Trust Center, 1209 North Orange Street, Wilmington DE 19801-1120.

22. On August 31, 2017, Old DuPont merged with The Dow Chemical Company to create DowDuPont, Inc. (hereinafter "DowDuPont"). Since the merger, DowDuPont has completed a series of separation transactions to separate its businesses into three independent, publicly traded companies for materials, science, and specialty products.

23. Defendant, Corteva, Inc. (hereinafter "Corteva"), is a Delaware Corporation with its principal place of business at 974 Centre Road, Wilmington DE 19805-1269. It is subject to service of process via its registered agent, The Corporation Trust Company, Corporation Trust Center, 1209 North Orange Street, Wilmington DE 19801-1120.

24. Corteva was initially formed in February 2018 as a subsidiary of DowDuPont. From that time until June 1, 2019, Corteva was a wholly owned subsidiary of DowDuPont.

25. On June 1, 2019, DowDuPont separated its agriculture business through the spin-off of Corteva (the "Corteva Spinoff"). On June 1, 2019, DowDuPont distributed to DowDuPont stockholders all issued and outstanding shares of Corteva common stock by way of a pro-rata dividend. Following that distribution, Corteva became the direct parent of Old DuPont.

26. Corteva holds certain DowDuPont assets and liabilities, including DowDuPont's agriculture and nutritional businesses.

27. On June 1, 2019, DowDuPont, the surviving entity after the spin-off of Corteva and of another entity known as Dow, Inc., changed its name to DuPont de Nemours, Inc., to be known as New DuPont. New DuPont retained assets in the specialty products business lines following the above-described spin-offs, as well as the balance of the financial assets and liabilities of DuPont not assumed by Corteva.

**A.      Defendants' Manufacture of GenX and Other PFAS at the FWP**

28.      The FWP is located near Duart Township in Bladen County, North Carolina, which is approximately 15 miles southeast of the City of Fayetteville and just south of the Bladen-Cumberland County line. The FWP contains approximately 2,150 acres of relatively flat undeveloped open land and woodland bounded on the east by the Cape Fear River, on the west by NC Highway 87, and on the north and south by farmland. The River is approximately 1,850 feet from the eastern portion of the manufacturing area, while Willis Creek, a tributary of the River, is approximately 3,000 feet from the northern portion of the manufacturing area. Parts of the Georgia Branch, another tributary to the River, flow along the FWP's southern boundary about one mile southwest of the manufacturing area. A drainage channel leading to the Cape Fear River is located south of the plant area. It is used as the outfall area ("Outfall 2") covered by National Pollutant Discharge Elimination System Permit No. NC003573 (the "NPDES Permit").

29.      The segment of the River affected by discharges from Outfall 002 is classified by the State of North Carolina as "Class WS-IV" surface water, making it a "source of water supply for drinking, culinary, or food-processing purposes" as well as for "aquatic life propagation and maintenance of biological integrity (including fishing and fish), wildlife, secondary recreation, [and] agriculture." 15A N.C.A.C. 2B.0211(1), 2B.0216(1); see also 15A N.C.A.C. 2b.0101; N.C. Gen. Stat. § 143-214.1(b).

30.      The FWP produces a variety of films, fibers, and specialty chemicals, and for years has had at least five discrete manufacturing areas: (1) Fluromonomers/Nafion; (2) Polymer processing aid ("PPA"); (3) Butacite; (4) SentryGlas; and (5) Polyvinyl fluoride ("PVF"). The wastewater from each of the five manufacturing areas flows through one or more on-site wastewater treatment plants, where the contaminated wastewater is diluted with hundreds of

thousands of gallons of river water before it is ultimately discharged into the River. This dilution makes the chemicals harder to detect but does not ultimately reduce the amount of contaminants flowing into the River.

31.    On information and belief, the FWP also has or had had at least one stack that has operated over the years as a source for airborne emissions of perfluoroalkyl substances, thereby giving rise to additional water contamination when airborne particles are deposited and dissolve and/or leach into groundwater. Plume modeling conducted in 2002 by DuPont Engineering demonstrates that Old DuPont's PFOA manufacturing processes would give rise to an airborne APFO (PFOA) plume with a "hot spot" directly over Willis Creek, which flows into River.[1]

32.    PFAS are highly toxic to humans. Scientists have linked exposure to PFAS such as GenX to kidney cancer, testicular cancer, prostate cancer, ovarian cancer, non-Hodgkin lymphoma, liver disease, ulcerative colitis, thyroid disease, hypercholesterolemia, and pregnancy-induced hypertension, among other illnesses. While Defendants have manufactured a number of PFAS at the FTP that were discharged into the River, the focus of this action is GenX and other PFAS that have never been used to manufacture firefighting foam. Conversely, this action does not assert claims arising from contamination involving perfluorooctanoic acid ("PFOA"), perfluorooctane sulfonate ("PFOS"), and/or their chemical precursors.[2]

**B.    Defendants' Knowledge of the Threats PFAS Discharges Pose to Public Health and the Environment**

33.    Since the 1980s, Defendants have used PFAS at its FWP. In the early 2000s, when government regulators pressured Old DuPont to stop using PFOA in its manufacturing processes,

---

[1] See also, *Legacy, and emerging airborne per- and polyfluoroalkyl substances (PFAS) collected on PM2.5 filters in close proximity to a fluoropolymer manufacturing facility,* https://pubs.rsc.org/en/content/articlelanding/2022/em/d2em00358a/unauth

[2] For this reason, all references in this Complaint to the discharge of "GenX and other PFAS" at the FWP should be interpreted as excluding PFOS and PFOA, as Plaintiff is not asserting any claims arising from contamination involving PFOS or PFOA.

Old DuPont (and later Chemours Co.) began to replace PFOA with its close chemical cousin, GenX. However, GenX may be even more toxic than PFOA. In addition, Defendants have continued to discharge Nafion byproducts 1 and 2, long-chain C7 PFAS produced only by Defendants, which have toxicity characteristics that are like PFOA.

34. Undeterred, undaunted, and uncaring for the results of its own toxicity studies, Defendants have discharged GenX, Nafion byproducts 1 and 2, and other PFAS into the River, showing the same cold disregard for human health that it showed in poisoning the Ohio River with PFOA. And, just as they did with PFOA, Defendants has concealed its dangerous discharge practices from government regulators and the public.

35. Defendants have been studying the health effects of the PFECA's known as Gen X since approximately 1963, when it conducted an acute oral toxicity study in rats to determine the lethal dose for exposure to Gen X's ammonium salt. DuPont's internal data studies have demonstrated an association between Gen X and various health effects in laboratory animals that are consistent with the effects of other PFASs, including effects in the liver, kidney, pancreas, testicles, and immune system.[3] Data from Defendants' various animal studies indicate that Gen X is an animal carcinogen in multiple organ systems in both male and female rats, and that Gen X poses reproductive/developmental risks, as well as toxicity in the liver, kidneys, the hematological system, the adrenal glands, the stomach, as well as other adverse effects.[4]

36. The toxicity results from reports of animal studies indicate that Gen X is a particularly toxic PFC. A substantive body of human studies have not been done at this time. However, based on the available animal studies, Gen X may be as toxic or more toxic to humans

---

[3] See TSCA Non-Confidential Business Information submitted to E.P.A. 8(e) Coordinator, USEPA, for 8EHQ-06-16478,

[4] See data reported in Lisa Craig, "H-28548: Combined Chronic Toxicity/Oncogenicity Study 2-Year Oral Gavage Study in Rats"– Laboratory Project ID: DuPont-18405-1238" (MPI Research, Inc., Mattawan, Michigan 2013) (sponsored by E.I. du Pont de Nemours and Company)

than PFOA. Likely human adverse effects from Gen X exposure could range from reproductive/developmental adverse effects to adverse liver effects, to human immune system/RNA messaging disruption adverse impacts, to stomach, ocular, and tongue toxicity, to human cancer. Human exposure to Gen X in drinking water is continuous, moreover, unlike the exposure in existing animal studies.

37.     Despite the results of these and similar studies, Defendants repeatedly failed to recover and capture (destroy) or recycle GenX from its wastewater. Instead, Defendants continued to discharge significant quantities of GenX into the River, the groundwater, and the air surrounding the FWP. Those discharges constitute a willful, wanton, and reckless risk of injury to human health and the environment. The impacts of which are likely to continue to manifest for decades to come.

38.     PFAS gets into the environment from industrial facilities that either make them or use them to make other products. It also enters the environment when released from PFC-containing consumer products during their use and disposal.

39.     PFAS can remain in the environment, particularly in water, for many years. PFAS can move through soil and into groundwater or be carried in air. GenX, compared to other PFAS, stays in the blood of humans for a relatively short time. This necessitates the use of other biomarkers to determine the amount of GenX exposure over prolonged periods.

## C.     Government Regulators and the Research Community Acknowledge the Health and Environmental Risks Posed by GenX and Other PFAS

40.     In November 2016, a team of prestigious scholars from North Carolina State University and researchers from other institutions published a study that identified GenX as one of several PFAS detected at the King's Bluff intake site along the Cape Fear River. Between June 14 and December 2, 2013, the research team took daily samples of raw water from the King's Bluff intake located downstream from the FWP, as well as from two areas located upstream from the FWP. The upstream sampling not only revealed the presence of so-called "legacy PFAS" at

King's Bluff but also detected GenX at levels as high as 4,500 parts per trillion ("ng/L" or "ppt"), with a mean (average) concentration of Gen X of 631 ppt—both well in excess of the current state health goal of 140 ppt.

41.    The North Carolina State researchers have continued their work as part of an ongoing GenX Exposure Study[5].

42.    GenX and the other PFAS found in the River have consistently been detected at levels far exceeding the EPA's interim HAL for PFOA/PFOS and North Carolina State equivalents. It is believed that there are a number of other chemical compounds that have not been specifically named or identified that have also been released from Defendants' operations at the FWP and have contaminated the River at unsafe levels for downstream consumers and the environment at large.

43.    On June 19, 2017, environmental regulators in Fayetteville and Wilmington began sampling and testing 13 locations along the Cape Fear River for the presence of GenX; their results showed that finished water from four water treatment plants had GenX concentrations exceeding the state's safety standard of 140 ppt, including a) Bladen Bluffs (790 ppt); b) NW Brunswick (910 and 695 ppt); c) Pender County (421 ppt); and d) CFPU Sweeney (1100 and 726 ppt). On June 20, 2017, under extreme public pressure, Chemours announced it would "capture, remove and safely dispose of" wastewater containing GenX, instead of discharging it into the Cape Fear River. Chemours did not mention that it had already contaminated the groundwater and was still emitting GenX into the air.

44.    Very recent testing suggests that GenX and other PFAS may have contaminated plants and vegetables around the FWP. On a video call between Dutch scientists (who are studying

---

[5] https://genxstudy.ncsu.edu/

GenX contamination at Chemours' plant in Dordrecht, Netherlands) and North Carolina's science advisory board, the Dutch scientists noted that carrots, beets, lettuce, and other vegetables at 10 sites around the Chemours plant had been tested for PFAS. Approximately 40% were contaminated with GenX and/or PFOA. Thus, North Carolina residents may have been or be currently eating—as well as drinking—PFAS and other toxic chemical compounds discharged at the FWP.

45.     In November 2018, the North Carolina State University Center for Human Health and the Environment released preliminary results from a study of blood and urine samples taken from individuals living nearby the FWP plant who consumed water from private wells and from individuals living in New Hanover County. The authors reported that four newly identified PFAS—as well as older PFAS such as PFOA—were detected in the blood of the study participants' blood. They further reported that 99% of the participants' blood tested positive for Nafion byproduct 2 at a median concentration of nearly 3 parts per billion (ppb). The study also confirmed that individuals who live near the FWP have more PFAS in their blood than individuals who live in other places (e.g., individuals living in Raleigh, Durham, and Chapel Hill, North Carolina, as well as Dayton, Ohio).

46.     On February 25, 2019, Chemours and the State of North Carolina signed, and the Bladen County Superior Court entered a Consent Order that, among other things, ordered Chemours to provide remedial measures to certain parties affected by Defendants' wrongful discharge of PFAS, including households, businesses, schools, and public buildings that use drinking-water wells.

47.     Specifically, the Consent Order requires Defendant Chemours to provide public water supplies, or under certain circumstances, whole-building filtration systems (and maintenance) to those parties whose drinking-water wells are contaminated by GenX and other

PFAS in a total amount exceeding 140 ppt or any applicable health advisory standard (currently set at 140 ppt), whichever is lower. Such parties may alternatively opt to receive reverse osmosis systems for every drinking water sink in their building.

48.     The Consent Order also requires Chemours to provide a minimum of three under-sink reverse osmosis water-filtration systems (or equivalent treatment) to any party with a drinking-water well contaminated by GenX (or any other PFC specifically listed on an attachment to the Consent Order) if the well-water tests above 10 ppt for any given compound or exceeds 70 ppt for the total concentration of all listed compounds. For any resident who receives permanent water supplies because of the Consent Order, Chemours must also pay for any and all water bills for each affected party for 20 years up to $75 per month, subject to adjustment by DEQ every 2 years for certain criteria specified in the Consent Order. Chemours is also required to provide ongoing testing of water for certain residents, as well as bottled water until the remedial measures provided for in the Consent Order are executed or a party declines the remedial measures provided therein.

49.     On June 15, 2022, the EPA released new drinking water health advisory levels for four PFAS, including a Final Health Advisory level of 10 ppt for GenX. These health advisories are "non-enforceable and non-regulatory" and "provide technical information to states agencies and other public health officials on health effects, analytical methods, and treatment technologies associated with drinking water contamination."[6] More specifically, EPA HALs "identify levels to protect all people, including sensitive populations and life stages, from adverse health effects resulting from exposure throughout their lives to these PFAS in drinking water."[7] The HALs are

---

[6] *See, e.g.*, EPA, *Drinking Water Health Advisories for PFAS Fact Sheet for Communities* at 1 (June 2022), *available at* https://www.epa.gov/system/files/documents/2022-06/drinking-water-ha-pfas-factsheet-communities.pdf. ("EPA PFAS Fact Sheet for Communities").

[7] *Id.*

calculated to offer a margin of protection against adverse health effects and account for other potential sources of exposure beyond drinking water (*e.g.*, food, air, consumer products, etc.), which provides an additional layer of protection.[8]

**D.    Difficulties of Removing and Remediating Contamination from GenX and Other PFAS at the FWP and Downstream Communities**

50.    GenX and the other PFAS discharged at the FWP will be exceedingly difficult to remove from North Carolina residents' pipes, fittings, and fixtures. Scientific studies have consistently demonstrated that PFAS and Nafion wastes bond with cells, including cells in the thin layer of microorganisms that coats municipal and residential pipes, water heaters, fixtures, and appliances, sometimes called a "biofilm."

51.    These biofilms can be difficult—if not impossible—to remove. But removing them is essential: individual microbes in a biofilm routinely die and break off from the film. The continuous dying and detachment of cells releases PFAS, including PFOAs, GenX and Nafion wastes, back into the water supply. In addition to bonding with biofilm, PFAS, PFOAs and PFOS such as GenX and Nafion wastes can adsorp (i.e., chemically bond) directly with the iron and iron oxide in pipes. Thus, these compounds can then "desorp" back into the water supply.

52.    PFAS, GenX, and the Nafion byproducts also exist in small stagnant pockets of water trapped in scale throughout homes' plumbing systems. If these small pockets of water are ever disturbed, they can release the toxins back into drinking water. These compounds reside in bacteria, biofilm, scale, iron, and iron oxide in the bottom of water heaters, the nooks and crannies of rusted pipes, and valves, elbows, and water fixtures, among other water-infrastructure locations. The pipes and fixtures thus act as a reservoir or sponge, continuously attracting and discharging toxic compounds back into the water supply. As such, true and lasting remediation can only be

---

[8] *See id.*

accomplished by replacing pipes, fittings, appliances, and fixtures and installing sufficient filtration systems from the water source all the way to the end-user cup/shower head/etc.

53. Currently, there is no known means to filter GenX and certain other legacy PFAS out of the water supply on a large-scale, long-term basis. And even if drinking water utilities develop a filtering method, GenX and other PFAS are already bound to the bio-films in municipal pipes and residential pipes, fittings, fixtures, and appliances. The only solution is to: (i) install a sophisticated water filtration system at the juncture connecting municipal pipes to the pipes for individual homes and businesses; (ii) remove and replace plumbing, fixtures, fittings, and appliances inside individual homes and businesses; and (iii) provide bottled water to residents in the interim. Meanwhile, until these remedial actions are complete, the residents will need to be supplied with bottled water for daily use. Many residents have already purchased bottled water for themselves to ensure the health and safety of their families.

**E.    Defendants' Fraudulent Transfers**

54. Defendants have engaged in a series of transactions in an effort to shield assets from, and otherwise hinder or delay Plaintiffs and other creditors.

55. In 2013, Old DuPont announced its intention to separate its performance chemicals business, including fluoroproducts, through a U.S. tax-free spin-off to shareholders. In this spinoff, a newly formed subsidiary would assume significant environmental and tort liabilities of Old DuPont, pay a multibillion-dollar dividend to Old DuPont, and be spun-off to Old DuPont's shareholders.

56. Chemours Co. was formed in February 2014 as a wholly owned subsidiary of Old DuPont, remaining so until July 1, 2015, when Old DuPont completed the spin-off, along with the assumption by Chemours Co. of vast environmental liabilities which included those related to PFOS and PFOA and fluorosurfactants ("the Chemours Spinoff").

57.     Through their effectuation of the spin-off in July 2015, Chemours Co. and Old DuPont caused Chemours Co. to transfer valuable assets to Old DuPont, including but not limited to a $3.9 billion dividend (the "Transfers"), while simultaneously assuming significant liabilities (the "Assumed Liabilities").

58.     At the time the Transfers were made and Assumed Liabilities were assumed, Chemours had a separate board; however, the board was controlled by Old DuPont employees.

59.     At the time the Transfers were made and Assumed Liabilities were assumed, Old DuPont had been sued, threatened with suit, and/or had knowledge of the likelihood of litigation to be filed regarding Old DuPont's liabilities for damages and injuries from the manufacture, sale, and/or disposal of PFAS-containing products. For example:

a)      In 2005, Old DuPont agreed to pay $16.5 million in civil penalties to the EPA to resolve eight counts of alleged violations of environmental statues concerning PFAS contamination.

b)      Also in 2005, Old DuPont agreed to pay $343 million to settle the class action lawsuit filed on behalf of 70,000 residents of the Ohio River Valley relating to the contamination of the watershed with PFOA. This settlement also created the C8 Science Panel, which, as discussed above, conducted studies on the health effects of PFOA exposure between 2005 and 2013.

c)      In 2015, at the time the Transfers were made and Assumed Liabilities were assumed, another MDL involving over 3,500 PFOA-related personal injury claims brought by citizens of Ohio and West Virginia was pending in Ohio.[9]

---

[9] On February 13, 2017, following three multimillion-dollar jury verdicts in three bellwether trials in the Ohio MDL, Old DuPont and Chemours Co. agreed to pay $671 million to resolve the Ohio MDL, with an additional $125 million promised by Chemours Co. for future PFOA costs not covered by the settlement for a period of five years.

60.     The assets Old DuPont transferred to Chemours were unreasonably small in relation to the business or transaction and to the Assumed Liabilities. As a result, Chemours Co. did not receive a reasonably equivalent value in exchange for its assumption of liabilities of Old DuPont.

61.     Old DuPont knew or reasonably should have known that Chemours Co. would incur debts beyond its ability to pay as they became due. Through the Transfers and Assumed Liabilities Old DuPont and Chemours Co. limited the availability of assets to cover all of the liability for damages and injuries arising from Old DuPont's manufacture and sale of PFAS-containing products.

62.     On information and belief, Old Dupont and Chemours Co. entered into the Transfers and provided for Chemours Co.'s assumption of the Assumed Liabilities with actual intent to hinder or delay Plaintiffs and other creditors.

63.     The assumption of liabilities by Chemours Co. did not relieve Old DuPont of liability for the claims asserted herein or other liabilities related to Old DuPont's manufacture and sale of PFAS-containing products.

64.     In furtherance of Old DuPont's efforts to shield assets from and otherwise hinder or delay creditors, in December 2015 Old DuPont and The Dow Chemical Company ("Dow") completed a merger in which each of them merged into a separate subsidiary of a newly formed entity, DowDuPont, Inc. ("DowDuPont"). On information and belief, Old DuPont and Dow merged into separate subsidiaries of DowDuPont as part of an effort to avoid exposing Dow to the existing liabilities of DuPont, including liability for the claims asserted herein and other PFAS liabilities.

65.     Following the Dow-DuPont merger, DowDuPont engaged in a series of significant internal reorganizations and other transactions (the "Corteva Spinoff"), including the transactions provided for in an April 1, 2019 Separation and Distribution Agreement (among DowDuPont and

its two subsidiaries, Dow, Inc. and Corteva, Inc. On information and belief, as part of the Corteva Spinoff, significant assets of Old DuPont were transferred to DowDuPont and Corteva for less than reasonably equivalent value, leaving Old DuPont with assets that were unreasonably small in relation to its business. After these transactions, Old DuPont had assets insufficient to pay its liabilities, including its liabilities for the claims asserted herein and other PFAS liabilities.

66.     The Corteva Spinoff was completed on or about June 1, 2019, when: (a) the "Agriculture Business" of Old DuPont was held by Corteva, (b) 100% of the stock of Old DuPont was held by Corteva, (c) the stock of Corteva was spun-off to the shareholders of DowDuPont, (d) the stock of the Dow, Inc. subsidiary of DowDuPont was distributed to the shareholders of DowDuPont, and (e) the "Specialty Products Business" and certain other assets of DuPont were retained by DowDuPont (whose name was changed to become the entity referred to herein as New DuPont).

67.     On information and belief, Defendants engaged in the Corteva Spinoff with actual intent to hinder or delay Plaintiffs and other creditors.

68.     Further, in effecting the Corteva Spinoff, Defendants knew or reasonably should have known that Old DuPont would no longer have sufficient assets to pay its liabilities, including its liabilities for the claims asserted herein and other PFAS liabilities.

69.     Further, as part of the DowDuPont Separation Agreement, Corteva and New DuPont assumed direct financial responsibility for certain liabilities of Old DuPont including, on information and belief, liability for the claims asserted herein and other PFAS liabilities. Corteva assumed responsibility for 29% of such liabilities and New DuPont assumed responsibility for 71% thereof.

## PLAINTIFFS' EXPERIENCES

70.     Plaintiffs incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

**A.     DEVON BARTHOLOMEW**

71.     Plaintiff, DEVON BARTHOLOMEW, has been a resident of New Hanover County since 2012.  Plaintiff's current residence is connected to the public water system.

72.     Plaintiff suffered personal injury damages as a proximate result of Defendants' actions and inactions alleged herein.

73.     Among Plaintiff's proximately caused damages, Plaintiff has suffered from Hypothyroidism.

**B.     SUSAN CARMINE**

74.     Plaintiff, SUSAN CARMINE, has been a resident of New Hanover County since 1987.  Prior to 1987, Plaintiff was a resident of Pender County since 1969.  Plaintiff's current and past residences are connected to the public water system.

75.     Plaintiff has suffered personal injury damages as a proximate result of Defendants' actions and inactions alleged herein.

76.     Among Plaintiff's proximately caused damages, Plaintiff has suffered from Hypothyroidism and Ulcerative Colitis.

**C.     LYNN HOLLAND**

77.     Plaintiff, LYNN HOLLAND, has been a resident of Brunswick County since 1985.  Plaintiff's current residence is connected to the public water system.

78.     Plaintiff suffered personal injury damages as a proximate result of Defendants' actions and inactions alleged herein.

Case 7:23-cv-01592-D-RN     Document 1     Filed 11/10/23     Page 19 of 30

79.     Among Plaintiff's proximately caused damages, Plaintiff has suffered from Hashimoto's Disease.

**D.     ROBERT JOHNSON**

80.     Plaintiff, ROBERT JOHNSON, has been a resident of Cumberland County since 1974.  Plaintiff's current residence is connected to the public water system.

81.     Plaintiff suffered personal injury damages as a proximate result of Defendants' actions and inactions alleged herein.

82.     Among Plaintiff's proximately caused damages, Plaintiff has suffered from Hypothyroidism.


## COUNT I : NEGLIGENCE

83.     Plaintiffs incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

84.     Defendants owed Plaintiffs a duty to exercise reasonable care.

85.     As alleged herein, Defendants, individually and collectively, breached their duty of reasonable care by allowing contaminants to be released into the Cape Fear River, as well as the drinking water and the airshed of New Hanover, Brunswick, Bladen, Cumberland, and Pender Counties.

86.     Upon learning of the release of the contaminants in 1980, Defendants owed Plaintiffs a continuing duty to act reasonably to remediate, contain, and eliminate the contamination before it injured Plaintiffs and to act reasonably to minimize the related personal damage.

87.     Defendants breached that duty by continuing to contaminate the local water supply and airshed, and by failing to act reasonably in providing usable water to Plaintiffs. Furthermore,

Defendants failed to take reasonable, adequate, and sufficient steps or action to eliminate, correct, or remedy any contamination after it occurred.

88. Defendants further breached that duty by failing to timely notify Plaintiffs of the contamination of the Cape Fear River, as well as the airshed, and the drinking water of New Hanover, Brunswick, Bladen, Cumberland, and Pender Counties, and of the presence of contaminants in the ground.

89. As a result of Defendants' breach of their duty to remediate the contamination, prevent the discharge of the contamination, and timely notify Plaintiffs of the contamination, Plaintiffs were forestalled from undertaking effective and immediate remedial measures, and Plaintiffs have expended and/or will be forced to expend significant resources to medically monitor and remediate the effects of the Defendants' negligence for many years into the future.

90. In addition, Defendants' breach of their duty to exercise reasonable care proximately caused damage to Plaintiffs' bodies, including but not limited to Hypothyroidism, Ulcerative Colitis, and Hashimoto's Disease.

## **COUNT II : GROSS NEGLIGENCE**

91. Plaintiffs incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

92. As alleged herein, Defendants, individually and collectively, caused drinking water with concentrations of GenX, and on information and belief other toxic chemicals, to be provided to Plaintiffs, in contravention of drinking water standards. As such, Defendants, either with gross negligence, recklessly, willfully, wantonly, and/or intentionally, contaminated the Cape Fear River and the drinking water of New Hanover, Brunswick, Bladen, Cumberland, and Pender Counties, and contaminated the accessible tap water of Plaintiffs.

93.     Defendants' conduct was so reckless as to demonstrate a substantial lack of concern for whether injury would result to Plaintiffs.

94.     In addition, Defendants' breach of their duty to exercise reasonable care proximately caused damage to Plaintiffs' bodies, as alleged above.

## COUNT III : NEGLIGENCE PER SE

95.     Plaintiffs incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

96.     Defendants owed Plaintiffs a duty to follow standards of conduct set forth in laws, regulations, and permits, whose purpose is to ensure public safety.

97.     By allowing GenX, and on information and belief related contaminants, to be released into the Cape Fear River as well as the drinking water and airshed of New Hanover, Brunswick, Bladen, Cumberland, and Pender Counties, Defendants violated federal and state public safety statutes and implementing regulations designed to safeguard human health and protect the environment, including, among others, the Clean Water Act, the Resource Conservation Recovery Act, the Safe Drinking Water Act, and the Solid Waste Disposal Act.

98.     As a direct and proximate result of Defendants' violation of these standards, Plaintiffs have suffered and continue to suffer personal damage, as described above.

## COUNT IV : PUBLIC AND PRIVATE NUISANCE

99.     Plaintiffs incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

100.    Defendants' acts and omissions in discharging contaminants into the air and water supply in and around the Cape Fear River caused and continue to cause substantial and

unreasonable interference with Plaintiffs' use and enjoyment of properties which they rent or otherwise do not personally own but are still entitled to unobstructed use and enjoyment of.

101. As further detailed in the allegations herein, when Defendants discharged contaminants into the air and the water supply in and around the Cape Fear River, Defendants knew that the discharge would invade Plaintiffs' interest in the use and enjoyment of their land. Additionally, Defendants' willful and wanton discharge of contaminants into the air and water supply in and around the Cape Fear River was negligent and/or reckless.

102. Defendants' substantial and unreasonable interference with the use and enjoyment of Plaintiffs' properties and continuing substantial and unreasonable interference with such use and enjoyment constitutes a continuing private and public nuisance.

103. Defendants' contamination has injured Plaintiffs' properties in a manner that is special to, and not shared by, the general public.

104. Defendants' nuisances proximately caused damage to Plaintiffs' properties. In addition, Defendants' nuisances proximately caused damage to Plaintiffs' bodies.

## COUNT V : TRESPASS TO REAL PROPERTY

105. Plaintiffs incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

106. Defendants' acts and omissions in willfully and wantonly discharging contaminants into the water supply in and around the Cape Fear River have resulted and continue to result in the release and threatened release of toxic chemicals at, under, onto, and into Plaintiffs' possessed properties.

107. The toxic chemicals present on Plaintiffs' possessed properties and in their body originating at the FWP were at all relevant times hereto, and continue to be, the property of Defendants.

108.     The invasion and presence of the toxic chemicals at, under, onto, and into Plaintiffs' possessed properties and bodies were and continues to be without permission or authority from Plaintiffs or anyone who could grant such permission or authority.

109.     The presence and continuing presence of the toxic chemicals at Plaintiffs' possessed properties and in their bodies constitutes a continuing trespass.

110.     As alleged in this complaint, Plaintiffs have been proximately harmed as a matter of law by Defendants' trespass.

111.     In addition, Defendants' trespasses proximately caused damage to Plaintiffs' bodies by violating their bodily integrity (i.e., contaminating their bodies), thereby necessitating future medical expenses, including regular testing.

## COUNT VI : UNFAIR AND DECEPTIVE TRADE PRACTICES
### N.C.G.S. § 75-1.1 et seq.

112.     Plaintiffs incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

113.     The North Carolina Unfair and Deceptive Trade Practices Act provides that "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce are declared unlawful." N.C. Gen. Stat. § 75-1.1(a). Defendants' unfair and deceptive practices alleged herein constitute unfair and deceptive acts or practices in or affecting commerce pursuant to N.C. Gen. Stat. § 75-1.1. Defendants' practices are illegal, unfair, or deceptive acts or practices in the conduct of trade or commerce and have created current and continuing unjust damages to Plaintiffs.

114.     Defendants' actions or omissions alleged herein constitute unfair or deceptive acts or practices in or affecting the "stream" - or, in this case, River - of commerce, namely that of a

water source that is relied upon by hundreds of thousands of North Carolinians, like these Plaintiffs.

115. Plaintiffs are injured "person[s]" pursuant to § 75-16 because they have been damaged due to Defendants' unfair or deceptive trade practices in contaminating the River and drinking water in at least five North Carolina counties.

116. Defendants' recurrent violations of environmental regulations and otherwise actions to poison the River offend public policy and are immoral, unethical, oppressive, unscrupulous, or substantially injurious to Plaintiffs.

117. Defendants' relevant officers, directors, or managers participated in or condoned the conduct constituting the unfair, unethical, immoral, and/or substantially injurious damages to Plaintiffs.

118. Plaintiffs allege that the benefit to the public good, far outweighs the inconvenience to the Defendants of ceasing to engage in the various practices described herein that violate North Carolina's unfair and deceptive practices act pursuant to N.C.G.S. §75-1.1.

119. Defendants have caused great harm to Plaintiffs, acting with implied malice and an outrageously conscious disregard for Plaintiffs' rights and safety, such that the imposition of trebled or punitive damages - whichever is greater - is warranted.

120. Defendants failed to incur expenditures to limit or prevent the release of GenX and other toxic PFAS into the environment and prevent the contamination of Plaintiffs' readily accessible water supplies, failed to incur the costs to timely investigate the impacts on Plaintiffs and their properties, failed to incur the costs to timely mitigate the impacts on Plaintiffs and their properties, and failed to incur costs to remediate the contaminated soil, dust and groundwater at Fayetteville Works. Defendants have been unjustly enriched by these and other failures to make

expenditures to prevent the person and properties of Plaintiffs from being contaminated with PFASs, GenX and Nafion byproducts.

## COUNT VII: ACTUAL FRAUDULENT TRANSFER

121. Plaintiffs incorporate by reference each and every allegation set forth in all preceding paragraphs as if fully restated herein.

122. Through their effectuation of the Chemours Spinoff, Chemours Co. transferred valuable assets to Old DuPont, including but not limited to the $3.9 billion dividend (the "Transfers"), while simultaneously assuming significant liabilities (the "Assumed Liabilities").

123. The Transfers and Assumed Liabilities were made for the benefit of Old DuPont.

124. At the time that the Transfers were made, and the Assumed Liabilities were assumed, and until the Spinoff was complete, Old DuPont was in a position to, and in fact did, control and dominate Chemours Co.

125. Defendants made the Transfers and incurred the Assumed Liabilities with the actual intent to hinder, delay, and defraud the creditors or future creditors of Chemours Co.

126. Plaintiffs have been harmed as a result of the conduct of Old DuPont and Chemours Co.

127. Plaintiffs are entitled to avoid the Transfers, to recover property or value transferred from Chemours Co. to Old DuPont, or to hold Old DuPont jointly and severally liable for any damages or other remedies against Chemours Co. that may be awarded by the Court or jury.

128. Defendants have further acted with actual intent to hinder, delay, and defraud Plaintiffs and other parties in connection with the Corteva Spinoff.

129. As part of the Corteva Spinoff, Old DuPont transferred valuable assets to Corteva, Inc. and/or New DuPont (f/k/a DowDuPont) without receiving a reasonably equivalent value in exchange for the transfer or obligation, when (i) it was engaged or was about to engage in a

business or a transaction for which the remaining assets of Old DuPont were unreasonably small in relation to the business; or (ii) Defendants intended for Old DuPont to incur, or believed or reasonably should have believed that Old DuPont would incur, debts beyond its ability to pay as they became due.

130. The Corteva Spinoff was made for the benefit of Corteva, Inc. and New DuPont.

131. Plaintiffs have been harmed as a result of the Corteva Spinoff.

132. Plaintiffs are entitled to avoid the Corteva Spinoff, to recover property or value transferred from Old Dupont to New DuPont and/or Corteva, Inc., or to hold New DuPont and Corteva, Inc. jointly and severally liable for any damages or other remedies against Old DuPont that may be awarded by the Court or jury.

## **COUNT VIII: CONSTRUCTIVE FRAUDULENT TRANSFER**

133. Plaintiffs incorporate by reference each and every allegation set forth in all preceding paragraphs as if fully restated herein.

134. Chemours Co. did not receive reasonably equivalent value from Old DuPont in exchange for the Transfers and Assumed Liabilities that were part of the Chemours Spinoff, nor did Old DuPont receive reasonably equivalent value for the assets it transferred to Corteva and New DuPont as part of the Corteva Spinoff.

135. The Chemours Spinoff was made to or for the benefit of Old DuPont, while the Corteva Spinoff was made to or for the benefit of Corteva and New DuPont.

136. At the time that the Transfers were made and the Assumed Liabilities were assumed, and until the Spinoff was complete, Old DuPont was in a position to, and in fact did, control and dominate Chemours Co.

137. At the time the Corteva Spinoff was effectuated and until it was completed, Corteva and New DuPont were in a position to, and in fact did, control and dominate Old DuPont.

138.     The Chemours and Corteva Spinoffs were effectuated at a time when the remaining assets of Chemours Co. and Old DuPont, respectively, were unreasonably small in relation to its business.

139.     Chemours Co. and Old DuPont were either insolvent, contemplating insolvency, or became insolvent as a result of the Chemours and Corteva Spinoffs.

140.     At the time that the Chemours and Corteva Spinoffs were effectuated, Defendants intended, believed, or reasonably should have believed that Chemours Co. and Old DuPont, respectively, would incur debts beyond their ability to pay as they became due.

141.     Plaintiffs have been harmed because of the Chemours and Corteva Spinoffs.

142.     Plaintiffs are entitled to avoid the transactions comprising the Chemours and Corteva Spinoffs, and to recover property or value transferred to Old DuPont, Corteva, and/or New DuPont as a result of those transactions.

## COUNT IX: PUNITIVE DAMAGES

143.     Plaintiffs incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

144.     Defendants' conduct in secretly releasing their persistent, bio-accumulative, and toxic PFAS and Nafion byproducts into the Cape Fear River and contaminating the drinking water source for thousands of North Carolinians, all the while misleading state and Federal regulators and the public, was willful and wanton, in that Defendants' acted with a conscious disregard for and indifference to the rights and safety of others, which Defendants knew or should reasonably have known was reasonably likely to result in injury, damage or harm.

145.     Defendants' willful and wanton conduct caused Plaintiffs to suffer injuries, damages, and harm as set forth above, for which Plaintiffs seek punitive damages as allowed by law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs request the following relief from the court:

a) An order for an award of compensatory damages;

b) An order for an award of punitive damages;

c) An order for equitable relief;

d) An order for pre-judgment and post-judgment interest;

e) An order for an award of reasonable attorneys' fees and litigation expenses; *and*

f) An order for all such other relief the Court deems just.

## TRIAL BY JURY

Plaintiffs request a trial by jury as to all those issues triable as of right.

Respectfully submitted by Plaintiffs' undersigned counsel.

Cary, North Carolina
Dated: November 10, 2023

**NAPOLI SHKOLNIK PLLC**

*/s/ Nevin Wisnoski*
Nevin Wisnoski (NC # 55038)
1213 Culbreth Drive
Suite 216
Wilmington NC 28405-3639
Tel: (919) 374-1971
Fax: (888) 870-2757
nwisnoski@napolilaw.com

Andrew W. Croner, Esq.
(*Special Appearance to be filed*)
360 Lexington Avenue
Floor 11
New York, NY 10017-6502
Tel: (212) 397-1000
Fax: (646) 843-7603
acroner@napolilaw.com

**NS PR LAW SERVICES LLC**

Paul J. Napoli, Esq.
(*Special Appearance to be filed*)
1302 Avenida Ponce de León
Santurce PR  00907-3982
Tel: (833) 271-4502
Fax: (646) 843-7603
pnapoli@nsprlaw.com

*Counsel for Plaintiffs*